UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS ESTES, | No. 2: 13-cv-0946 JAM KJN P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| SACRAMENTO COUNTY, et al., | |
| Defendants. | |

Introduction

     Plaintiff is a federal prisoner, proceeding without counsel, with an action brought pursuant to 42 U.S.C. § 1983 and Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971). Pending before the court is the summary judgment motion filed on behalf of defendants Bauer, Sacramento County and the Sacramento County Sheriff's Department. (ECF No. 43.) The claims against defendants Sara Sloan and the United States Marshal Service ("USMS") have been dismissed. (ECF Nos. 42, 45.)

     After carefully reviewing the record, the undersigned recommends that defendants' summary judgment motion be granted.

Legal Standard for Summary Judgment

     Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if the

1

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

1  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
2  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return
3  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436
4  (9th Cir. 1987).

5        In the endeavor to establish the existence of a factual dispute, the opposing party need not
6  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual
7  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
8  trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce
9  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
10 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
11 amendments).

12       In resolving a summary judgment motion, the court examines the pleadings, depositions,
13 answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R.
14 Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at
15 255. All reasonable inferences that may be drawn from the facts placed before the court must be
16 drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences
17 are not drawn out of the air, and it is the opposing party's obligation to produce a factual
18 predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F.
19 Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to
20 demonstrate a genuine issue, the opposing party "must do more than simply show that there is
21 some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could
22 not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
23 trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

24 Plaintiff's Allegations

25       This action is proceeding on the verified amended complaint filed August 22, 2013. (ECF
26 No. 9.) Plaintiff alleges that he received inadequate medical care while housed at the Sacramento
27 County Jail as a pretrial detainee. (Id. at 3.) Plaintiff alleges that he was not prescribed adequate
28 pain medication and that he did not receive proper treatment and necessary surgery for a foot

1 injury.

2       In particular, plaintiff alleges that on or around September/October 2012, he injured his
3 left foot while housed at the Sacramento County Jail. (Id.) Plaintiff alleges that on the day of the
4 injury, he was taken to an outside hospital for an examination and diagnosis. (Id.) Plaintiff
5 alleges that the doctor at the outside hospital prescribed immediate surgery for plaintiff's
6 fractured foot, an MRI prior to the surgery, and narcotics for pain. (Id. at 3, 5.)

7       Plaintiff alleges that when he returned to the jail, defendant Baur, a physician's assistant,
8 refused to prescribe narcotics for pain because defendants Sacramento County and the
9 Sacramento County Sheriff's Department had a policy prohibiting the prescription of narcotics to
10 inmates. (Id. at 3.) Plaintiff further alleges that when he complained to defendant Bauer that the
11 pain medication he had received was not working, defendant Bauer accused plaintiff of seeking
12 narcotics. (Id.) Defendant Bauer allegedly told plaintiff, "I don't care if you are in pain...if you
13 don't like it you shouldn't have come to jail!" (Id.) Plaintiff alleges that he suffered from
14 disabling pain as a result of not receiving narcotics. (Id.)

15       Plaintiff alleges that after he returned to the jail, defendant Bauer and jail employee
16 Stephanie Christensen reviewed the outside doctor's diagnosis and order for an MRI and surgery.
17 (Id. at 5.) Plaintiff alleges that former defendants USMS and Sara Sloan had to approve the MRI
18 before defendant Sacramento County Jail could arrange for it. (Id.) Plaintiff alleges that he
19 received the MRI in December 2012. (Id.)

20       Plaintiff alleges that in January 2013, he was taken to the San Joaquin General Hospital
21 for a surgical consultation. (Id.) Plaintiff alleges that the surgeon recommended immediate
22 surgery. (Id.)

23       Plaintiff alleges that former defendants Sara Sloan and USMS delayed his receipt of the
24 MRI and surgery, causing long term physical damage to his foot. (Id. at 5-7.)

25 <u>Plaintiff's Legal Claims</u>

26       Plaintiff's amended complaint alleges that defendants Bauer, Sacramento County and the
27 Sacramento County Sheriff's Department violated his constitutional right to adequate medical
28 care for failing to give him narcotics for pain. Plaintiff's amended complaint also alleges that

former defendants Sara Sloan and USMS violated his constitutional right to adequate medical care by delaying his receipt of an MRI and surgery for his broken foot.[1]

Defendants Bauer, Sacramento County and Sacramento County Sheriff's Department have construed the amended complaint to state two claims against them: 1) failure to give narcotics; and 2) delaying plaintiff's receipt of surgery and treatment for his broken foot. Accordingly, the undersigned addresses both of these claims in these findings and recommendations.

Defendants' Evidence

The undersigned herein sets forth defendants' evidence submitted in support of their summary judgment motion. The only items of evidence attached to plaintiff's opposition are emails between plaintiff's trial counsel and the Sacramento County Jail. In the section below addressing the merits of defendants' motion, the undersigned addresses, where relevant, the emails attached to plaintiff's opposition, plaintiff's deposition testimony and plaintiff's verified amended complaint. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

Although plaintiff refers to defendant Bauer as a physician's assistant in the amended complaint, it appears undisputed that defendant Bauer is actually a medical doctor.

In February 2012, plaintiff arrived at the Sacramento County Jail as a pretrial detainee. (Plaintiff's Deposition at 5.)

Dr. Neblett is an agency physician conducting a weekly orthopedic clinic at the Sacramento County Jail since August 2003. (ECF No. 43-7 at 1.) Dr. Neblett's area of practice is orthopedics and orthopedic surgery. (Id.) He has been board certified in orthopedics since January 1967. (Id.)

////

---

[1] As noted above, the claims against defendants Sara Sloan and the United States Marshal Service were previously dismissed. (ECF Nos. 42, 45.)

5

Plaintiff was evaluated by Nurse Munn at the jail on August 25, 2012. (ECF No. 43-6 at 3.) At that time, plaintiff reported that he passed out while exercising with profound swelling in his left foot. (Id.) A cold pack was applied to his left foot for comfort and to reduce swelling, and plaintiff was transported to San Joaquin General Hospital for evaluation. (Id.)

Plaintiff was diagnosed at the hospital with a foot sprain. (ECF 43-2 at 60, 64.) An x-ray taken of plaintiff's left foot was negative for any fracture. (Id. at 60, 64, 67.) The hospital also performed a CT of plaintiff's head to rule out a head injury, which was also negative. (Id.) Plaintiff was given one Vicodin for pain and the hospital treating physician recommended for plaintiff to continue with a non-steroidal anti-inflammatory drug ("NSAID") (Motrin), and thereafter apply an ace bandage and use crutches. (ECF No. 43-2 at 61, 64, 70; ECF No. 43-6 at 3.)

Upon his return from the hospital on the morning of August 26, 2012, plaintiff was seen again by Nurse Munn. (ECF No. 43-6 at 3.) Plaintiff was provided hydrocodone-acetaminophen (2 doses per day), a narcotic, for two days, was ordered to be housed on the medical floor and was ordered to the Medical Department Specialty Clinic on Monday for follow-up. (ECF No. 43-1 at 30; ECF No. 43-2 at 74; ECF No.43-6 at 3, 9.)

On August 27, 2012, jail physician Dr. Nugent ordered crutches, a Coban bandage wrap (a figure eight wrap of the entire foot and ankle), and Relafen medication (to treat pain or inflammation). (Id.)

On August 28, 2012, it was noted by jail staff that plaintiff was ambulating by wheelchair, and still awaiting crutches. (Id. at 4.) Later that day, it was noted that plaintiff was fitted with crutches. (Id.)

On the evening of August 28, 2012, plaintiff was examined by Licensed Vocational Nurse Borrego for plaintiff's complaints of swelling. (Id.) Nurse Borrego's notes state that she unwrapped the ankle and found no heat or heavy swelling. (ECF no. 43-3 at 12.) Nurse Borrego rewrapped the ankle a little looser to allow for any additional swelling, if it occurred. (Id.) Plaintiff was also given an ice pack and told to elevate his foot. (Id.)

////

On August 29, 2012, defendant Bauer requested a consultation with an orthopedic specialist for the left ankle sprain, noting that the x-ray was negative for a fracture. (ECF No. 43-6 at 4.) Defendant Bauer ordered for plaintiff to continue on his crutches and referred him to the in-house orthopedic specialist, Dr. Neblett. (Id.) Defendant Bauer also prescribed Naproxen 500 mg. per day for pain. (Id.) Naproxen is an NSAID in the same class of drugs as Motrin, and is an effective anti-inflammatory and pain reliever. (Id.)

Plaintiff received Naproxen twice a day from August 27, 2012, to September 27, 2012. (Id.) On September 7, 2012, plaintiff also began receiving Gabapentin prescribed by Dr. Pagliere, which plaintiff took until November 14, 2012. (Id.) Plaintiff restarted Naproxen on October 30, 2012, and he took it until November 19, 2012, when he refused the medication and it was discontinued the next day. (Id.) The Naproxen was restarted on December 19, 2012, after plaintiff reported that he had re-injured his left foot. (Id.)

On September 4, 2012, another x-ray was taken and revealed a normal exam. (ECF No. 43-1 at 55.) On that date, plaintiff was seen by Dr. Neblett. (ECF No. 43-3 at 11.) The notes from this examination state that Dr. Neblett saw plaintiff "regarding sprained left ankle and improperly applied ace bandage." (Id.) Dr. Neblett noted that plaintiff had been re-applying the bandage. (Id.) Dr. Neblett advised plaintiff to continue use of crutches and start "ROM" (range of motion) exercises. (Id.) Plaintiff was advised to return to the clinic in one week. (Id.)

On September 5, 2012, defendant Bauer saw plaintiff for a follow-up appointment. (ECF No. 43-6 at 5.) Dr. Bauer noted that plaintiff had increased pain in his left foot and redness which was getting progressively worse. (Id.) Defendant Bauer removed the ankle support which had not helped. (Id.) Defendant Bauer was concerned about possible cellulitis or gout, and prescribed Septra and rifampin (antibiotics), continued the Naproxen, and advised plaintiff to elevate his foot. (Id.)

On September 6, 2012, Dr. Pagliere saw plaintiff at the jail clinic for a follow-up. (ECF No. 43-3 at 10.) Dr. Pagliere noted that the x-rays were negative. (Id.) Dr. Pagliere diagnosed plaintiff with a sprain, and doubted that plaintiff had either cellulitis or gout. (Id.) Dr. Pagliere ordered plaintiff to continue with his medications and placed him on a trial of Gabapentin (aka

7

1 | Neurontin).  (Id.)  Dr. Pagliere ordered a follow-up with an orthopedic specialist in one week and
2 | for plaintiff to remain on the medical floor of the jail.  (Id.)
3 |       On September 11, 2012, additional x-rays of plaintiff's left foot were taken.  (ECF No. 43-
4 | 2 at 50.)  The results were negative, i.e., normal.  (Id.)  On that date, Dr. Neblett again saw
5 | plaintiff.  (ECF No. 43-7 at 4.)  He diagnosed plaintiff with multiple ligament injuries to his left
6 | leg.  (Id.)  He recommended that plaintiff continue wearing his splint boot and using his crutches,
7 | and he recommended that plaintiff return to the clinic in one week with no new x-rays needed.
8 | (Id.)
9 |       On September 13, 2012, Dr. Pagliere again saw plaintiff, noting that the left foot pain was
10 | reportedly down by 50%.  (ECF No. 43-6 at 5.)  The swelling was reduced over plaintiff's lateral
11 | foot with some tenderness in the left midfoot and distal external leg.  (Id. at 5-6.)  Dr. Pagliere
12 | diagnosed the condition as a severe sprain, improved, and ordered plaintiff to continue with the
13 | foot equalizer boot (splint boot), crutches, the prescription medications, and ordered a follow-up
14 | with the orthopedist, Dr. Neblett.  (Id. at 6.)
15 |       On September 18, 2012, Dr. Neblett saw plaintiff for a follow-up appointment.  (Id.)  He
16 | again documented ligament injuries in the left leg, and recommended for plaintiff to continue
17 | wearing the splint boot.  (Id.)  Dr. Neblett ordered plaintiff to return to the clinic in one week with
18 | no x-ray needed.  (Id.)
19 |       On September 25, 2012, Dr. Neblett saw plaintiff for a recheck appointment.  (Id.)  Dr.
20 | Neblett noted multiple sprains in the left ankle, recommended plaintiff continue to wear the splint
21 | boot, and ordered a return to the clinic in three weeks with no x-ray needed.  (Id.)
22 |       On October 12, 2012, defendant Bauer referred plaintiff for an orthopedic consultation.
23 | (Id.)  On October 16, 2012, Dr. Neblett saw plaintiff, again noting multiple sprains of the left
24 | ankle with possible rupture of the posterial tibial tendon.  (Id.)  At that time, Dr. Neblett
25 | recommended an MRI to determine the question of a possible tendon injury, to continue the boot
26 | splint and crutches, and noted that, pending MRI results, surgery may be indicated.  (Id.)
27 |       On October 16, 2012, defendant Bauer ordered an MRI of the left foot according to Dr.
28 | Neblett's instructions.  (Id.)  The orders for outside medical services are typically forwarded to

Correctional Health Services ("CHS") Case Management, which obtains the authorizations for outside services such as an MRI study. (Id.) Defendant Bauer is not involved in this process. (Id.) It is defendant Bauer's understanding that the USMS was required to authorize the MRI for plaintiff because he was a federal prisoner being housed at the Sacramento County Jail. (Id.)

On October 25, 2012, a consult request for an MRI was processed to CHS Case Management, and an MRI questionnaire was forwarded to nursing staff at the Main Jail to be completed with the patient, i.e., plaintiff. (Id. at 7.) Plaintiff filled out the questionnaire and it was faxed back to nursing staff the same day. (Id.) On October 26, 2012, a Treatment Authorization Request ("TAR") was sent to the USMS to request authorization for the MRI. (Id.)

On October 30, 2012, defendant Bauer noted that plaintiff asked about when he would get an MRI. (Id.) Defendant Bauer advised plaintiff that it was in the works. (Id.)

On November 14, 2012, "it was noted" that the consult request for an MRI had been authorized and forwarded for an appointment to be scheduled. (Id.) On the same day, the records reflect that plaintiff was seen by Nurse Ruiz, with plaintiff's complaints of swelling in the left foot and calf status post strain. (Id.) Plaintiff stated that he was using crutches, and admitted not wearing the splint boot as ordered and not keeping his foot elevated for much of the day. (Id.) Nurse Ruiz noted that plaintiff had been seen by orthopedic specialist, Dr. Neblett, multiple times, and that the MRI was ordered, approved and awaiting scheduling. (Id.) Plaintiff was advised to keep his foot elevated as much as possible.[2] (Id.) It was also noted that plaintiff refused his Naproxen and Baclofen on November 19, 2012, and November 20, 2012, and these medications were discontinued per plaintiff's refusal. (Id.)

On November 30, 2012, an MRI was conducted. (ECF No. 43-2 at 28-29.) The results showed a chronic Lisfranc's ligament tear with avulsion fracture of the base of the second metatarsal and lateral sublaxation (partial dislocation) of the bases of second and third metatarsals. (ECF No. 43-2 at 28-29; ECF No. 43-7 at 5.)

---

[2] In his opposition, plaintiff claims that health care providers refused to give him a device to elevate his foot. (ECF No. 48 at 3.) Plaintiff has provided no evidence, expert or otherwise, that he required a special device to elevate his foot. At his deposition, plaintiff testified that he was given a blanket to elevate his foot. (Plaintiff's deposition at 28: 13-14.)

On December 13, 2012, the medical records reflect that Nurse Keithley documented that she saw plaintiff not wearing his orthopedic boot when coming out for pill call on December 12, 2012, and noted that he was walking without difficulty.[3] (ECF No. 43-6 at 8.)

On December 19, 2012, defendant Bauer noted that plaintiff had slipped in the shower, aggravating the pain in his left foot. (Id.) Defendant Bauer noted the MRI findings as well. (Id.) Defendant Bauer ordered plaintiff to continue Naproxen for pain, an orthopedic consultation with Dr. Neblett to re-evaluate the need for surgery, and an x-ray of the left foot and ankle. (Id.)

On December 20, 2012, an x-ray of plaintiff's left ankle was done. (ECF No. 43-2 at 25.) The results showed that "no fracture, dislocation or other acute osseous or joint abnormality is identified." (Id.) The results of the x-ray were "no change since 9/11/12." (Id.)

On December 28, 2012, Dr. Neblett saw plaintiff in the orthopedic clinic for a follow-up. (ECF No. 43-7 at 6.) Dr. Neblett noted that it had been very difficult to diagnose plaintiff's injury due to the swelling and inability to palpate the area of injury. (Id.) Dr. Neblett advised referral for a surgery consult to an orthopedic surgeon who specializes in feet. (Id.)

On December 28, 2012, defendant Bauer completed a consultation request in which he requested a consultation with an outside orthopedic surgeon who works on feet, as recommended by Dr. Neblett. (ECF No. 43-6 at 8.) Thereafter, another request for consultation was completed by the jail's medical director, Dr. Robert Padilla, on January 17, 2013. (Id.) The record does not reflect why Dr. Padilla made the second request for consultation.

Plaintiff was seen at San Joaquin General Hospital on February 5, 2013, by orthopedic specialist Dr. Gunnoe. (Id.) Dr. Gunnoe noted that plaintiff needed to return with the MRI films before they would operate. (Id.) Dr. Bauer noted that case management was contacted and they were aware and in the process of getting a copy of the MRI. (Id.)

On March 13, 2013, defendant Bauer noted that plaintiff had had an MRI which showed a Lisfranc injury and deltoid strain of left ankle, that he was awaiting surgery, and would need to

---

[3] In his opposition, plaintiff alleges that he was walking around with crutches on this date. (ECF No. 48 at 3.) However, plaintiff provides no admissible evidence to support his claim that he was not walking without difficulty.

10

remain on the medical floor at the jail (2E) with his splint boot.  (Id. at 9.)  Thereafter, defendant Bauer did not see plaintiff again, and the medical records reflect that plaintiff was released from Sacramento County Jail custody on March 20, 2013.  (Id.)

Legal Standard for Claim by Pretrial Detainee Alleging Inadequate Medical Care

To state a section 1983 claim for a constitutional violation based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A pretrial detainee's claim for unconstitutional conditions of confinement arises from the Fourteenth Amendment Due Process Clause rather than from the Eighth Amendment prohibition against cruel and unusual punishment.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).  Nevertheless, the same standards are applied, requiring proof that the defendant acted with deliberate indifference. See Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendant possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 501 U.S. 294, 297–99 (1991); McKinney v. Anderson, 959 F.2d 853, 854 (9th Cir. 1992).  A serious medical need is one that significantly affects an individual's daily activities, an injury or condition a reasonable doctor or patient would find worthy of comment or treatment, or the existence of chronic and substantial pain.  See, e.g., McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled on other grounds by WMX Techs. v. Miller, 104 F.2d 1133, 1136 (9th Cir. 1997) (en banc).

Deliberate indifference may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care is provided.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).  To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."

Id. at 842. A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).

A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id. However, it is important to differentiate common law negligence claims of malpractice from claims predicated on violations of the Eight Amendment's prohibition of cruel and unusual punishment. In asserting the latter, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105–06).

Legal Standard for Municipal Liability

A municipal entity may not held liable under section 1983 for the unconstitutional acts of its employees on a theory of respondeat superior. Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011). Under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), a municipality may only be held liable under section 1983 where the constitutional violation was caused by the municipality's policy, custom, or practice. Id. at 690–91. "[I]t is not enough for a section 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." Bd. of Cnty. Commis of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (internal quotation marks omitted).

Monell limits municipal liability to instances where the plaintiff's claims are based on one of three theories: (1) that the alleged constitutional injury was "committed ... pursuant to a formal governmental policy or a longstanding practice or custom;" (2) "that the individual who committed the constitutional tort was an official with final policymaking authority;" or (3) "that an official with final policymaking authority ratified a subordinate's unconstitutional decision or action and the basis for it." Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992) (internal quotation marks omitted).

////

////

Qualified Immunity

Defendant Bauer moves for summary judgment on grounds that he is entitled to qualified immunity.

The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for resolving government officials' qualified immunity claims." Id. at 232. First, a court must decide if the alleged facts make out a violation of a constitutional right. Id. at 201. This part of the inquiry "mirrors the substantive summary judgment decision on the merits." Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. Saucier, 533 U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, 555 U.S. at 232. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." Id. (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Discussion

*Failure to Receive Narcotics*

In his verified complaint, plaintiff alleges that he was denied narcotic pain medication following his return to the jail, as recommended by the doctor at the emergency room, pursuant to a policy that prohibited inmates from receiving narcotics. In his verified complaint, plaintiff alleges that defendant Bauer told plaintiff that plaintiff would not receive narcotics pursuant to the Sacramento County Sheriff's Department's "no narcotics" policy. In addition, at his deposition, plaintiff testified that several people on the Sacramento County Jail staff, including

////

////

defendant Bauer, told him that the jail had a "no narcotics" policy.[4] (Plaintiff's deposition at 33-34.)

Defendants have provided the medical records from the San Joaquin County Hospital, where plaintiff was taken, indicating that the emergency room physician recommended that plaintiff receive Motrin, an NSAID, following his return to the jail. (ECF No. 43-2 at 61, 64.) In other words, the records reflect that the emergency room physician did not reflect that plaintiff receive narcotics. Defendants have also provided medical records from the Sacramento County Jail demonstrating that when plaintiff returned to the jail from the hospital on August 26, 2012, Nurse Munn prescribed hydrocodone-acetaminophen, a narcotic, for pain for two days. (ECF No. 42-2 at 74) This medical record indicates that the prescription for hydrocodone-acetaminophen was ordered by Dr. Levisman. (Id.)

Defendants have also provided evidence that after the hydrocodone-acetaminophen expired, plaintiff was prescribed Naproxen, an NSAID, for pain and to reduce swelling. In his declaration, defendant Bauer states, in relevant part,

> For chronic (on-going) pain and inflammation (swelling), I typically prescribe steroidal anti-inflammatory drugs (NSAIDS) for conditions such as a sprained foot or ankle because the NSAIDS are effective to reduce swelling and have less side effects than narcotics (which include a significant risk of drug dependence and addiction). Naproxen is a non-steroidal anti-inflammatory drug (NSAID), and is commonly prescribed for pain management or inflammation. Based on my medical experience and judgment, I believed it was medically appropriate and reasonable to prescribe Naproxen for [plaintiff's] condition. In addition, Gabapentin is another medication that can be prescribed for neuropathic (nerve) pain as was prescribed for [plaintiff].

(ECF No. 43-6 at 9-10.)

Plaintiff's claim in his deposition testimony and verified complaint that the emergency room physician recommended narcotics and that plaintiff was then denied narcotics due to a "no narcotics" policy is contradicted by the medical records submitted by defendants. These records were prepared by individuals who are not defendants in this action. Plaintiff does not address

---

[4] Plaintiff's emails attached as exhibits to the amended complaint are not relevant to his claim alleging failure to receive narcotics following his return to the jail in August 2012.

those records in his opposition.  Because plaintiff's allegations regarding his failure to receive narcotics are contradicted by the medical records submitted by defendants, they are disregarded. See Scott v. Harris, 550 U.S. 372, 380 (2007) (in ruling on a motion for summary judgment, a court may disregard a version of the facts that is blatantly contradicted by the record).

Defendants have presented the following unopposed evidence:  1) the emergency room physician recommended that plaintiff be prescribed Motrin, an NSAID, following his return to the jail; 2) plaintiff was prescribed narcotics for two days following his return to the jail; and 3) plaintiff was prescribed Naproxen, an NSAID, and later Gabapentin, after the narcotics prescription expired.  While defendants have not directly addressed plaintiff's claim that he was told the jail had a "no narcotics" policy, they have presented evidence that plaintiff was prescribed narcotics.  For these reasons, the undersigned finds that plaintiff's claim that he was denied narcotics, as recommended by the emergency room doctor, pursuant to a "no narcotics" policy, is not supported by the record.  Defendants' unopposed evidence demonstrates that plaintiff received adequate pain medication.  Accordingly, defendants Bauer, Sacramento County and Sacramento County Sheriff's Department should be granted summary judgment as to this claim.

Because the undersigned finds that defendant Bauer should be granted summary judgment on grounds that he did not violate plaintiff's constitutional rights, no further discussion of qualified immunity is warranted.

*Failure to Treat Foot Injury*

In the verified amended complaint, plaintiff alleges that the emergency room physician diagnosed him with a broken foot, and recommended that he receive surgery immediately following an MRI.  Plaintiff suggests that defendant Bauer disregarded these recommendations. Defendant Bauer moves for summary judgment as to this claim on grounds that he did not act with deliberate indifference with respect to his treatment of plaintiff's foot injury.

Defendants have presented medical records demonstrating that the emergency room doctor diagnosed plaintiff with a foot sprain and that the x-ray taken at the hospital was negative for any fracture.  The records demonstrate that the emergency room physician did not recommend

15

an MRI and surgery. Plaintiff does not address these records in his opposition. Because plaintiff's allegations that the emergency room doctor diagnosed a fracture and ordered immediate surgery are contradicted by the medical records submitted by defendants, they are disregarded. See Scott v. Harris, 550 U.S. 372, 380 (2007) (in ruling on a motion for summary judgment, a court may disregard a version of the facts that is blatantly contradicted by the record).

Turning to the treatment defendant Bauer provided plaintiff, as observed by defendants, defendant Bauer's primary role consisted of requesting appointments with orthopedic specialists, referral for an MRI, and issuing orders for prescriptions and for plaintiff to remain on the main medical floor. Most of the treatment plaintiff received for his foot was from orthopedic specialists. The record, as set forth above, does not demonstrate that defendant Bauer denied plaintiff treatment or contributed to any delay in his treatment. In his declaration, defendant Bauer states,

> As an internal medicine specialist, I deferred to the opinions of the orthopedic specialists to whom I referred [plaintiff]. Dr. Neblett, the orthopedic specialist, and other physicians who saw plaintiff at the jail, concurred that [plaintiff] had suffered a severe sprain until October 16, 2012 when Dr. Neblett noted that [plaintiff] may also have a possible rupture of the posterial tibial tendon. When Dr. Neblett recommended an MRI study to inquire further into Mr. Estes' condition on October 16, 2012, I completed a request for authorization for the MRI on the same day. And when Dr. Neblett recommended a consultation with an orthopedic surgeon who specialized in feet on December 28, 2012, I requested a consultation with an outside orthopedic surgeon who works on feet as recommended by Dr. Neblett on the same day.

(ECF No. 43-6 at 9.)

In his declaration, Dr. Neblett describes his attempts to diagnose plaintiff's injury

> 15. On 12/29/12, I again saw [plaintiff] in the orthopedic clinic for a follow-up. I noted that it had been very difficult to diagnose [plaintiff's] injury due to the swelling and inability to palpate the area of injury. I advised a referral for a surgery consult to an orthopedic surgeon who specializes in feet. (Ex. A. P.100; Ex. B, Page 5 of 9.)
>
> ****
>
> 17. During my visit(s) with [plaintiff], I recall discussing the mechanism of the injury with [plaintiff], and found it odd, although not impossible, that such an injury could have occurred as described by [plaintiff]. The injury presented by [plaintiff] was an unusual

16

> sprain. As the injury did not improve as expected, I then suspected a posterior tibial tendon injury in addition to the sprains. Because the injury did not improve as expected, on 10/16/12, I recommended an MRI which revealed the Lisfranc ligament tear which could not be visualized on the x-rays. The initial ankle sprain had probably resolved, and the residual problem was in the midfoot (the Lisfranc tear) which is a rather unusual injury and was difficult to diagnose due to marked swelling over many areas).

(ECF No. 34-7 at 5-6.)

Defendants' unopposed evidence demonstrates that defendant Bauer prescribed plaintiff with pain medication and made timely referrals for further treatment and testing based on the recommendations of the orthopedic specialists. Defendants' unopposed evidence demonstrates that defendant Bauer appropriately deferred to the orthopedic specialists regarding the treatment of plaintiff's foot injury. While there was delay in diagnosing plaintiff's injury, there is no evidence that defendant Bauer took any actions which contributed to the delay. Rather, the evidence demonstrates that the delay in diagnosis by the orthopedic specialist was primarily caused by the unusual nature of the injury and the inherent difficulty in diagnosing it. There is also no evidence that Dr. Gunnoe's failure to be provided with plaintiff's MRI films during the February 5, 2013 orthopedic consult was caused by any action taken by defendant Bauer.

The emails attached as exhibits to plaintiff's opposition are between plaintiff's trial counsel, Tim Zindel, and officials at the Sacramento County Jail, in November 2012. (ECF No. 48 at 9-12.) In these emails, Mr. Zindel expressed concern regarding the treatment of plaintiff's foot injury. (Id.) In response to these emails, a jail official stated that the scheduling of plaintiff's MRI was awaiting approval by former defendant USMS. (Id.) In the reply to plaintiff's opposition, defendants object to these emails on grounds that they lack authentication and foundation, and are hearsay. While defendants' objections have merit, these emails are not evidence of deliberate indifference by defendants Bauer, Sacramento County and the Sacramento County Sheriff's Department with respect to plaintiff's foot injury.

In the reply to plaintiff's opposition, defendants state that it is unfortunate that plaintiff suffered this unusual (and difficult to diagnose) injury. The undersigned agrees. However, for the reasons discussed above, the undersigned finds that defendant Bauer did not act with

deliberate indifference with respect to his treatment of plaintiff's foot injury.  Accordingly, defendant Bauer should be granted summary judgment as to this claim.[5]

Because the undersigned finds that defendant Bauer should be granted summary judgment on grounds that he did not violate plaintiff's constitutional rights, no further discussion of qualified immunity is warranted.

With respect to defendants Sacramento County and the Sacramento County Sheriff's Department, there is no evidence that plaintiff failed to receive constitutionally adequate treatment for foot injury pursuant to a municipal policy.  For this reason, defendants Sacramento County and Sacramento County Sheriff's Department should be granted summary judgment as to this claim.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF No. 43) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The

////

////

////

---

[5] In the summary judgment motion, defendants presented evidence that on January 22, 2014, plaintiff was seen by orthopedic surgeon Saeed Malekafzali for his foot.  (ECF No. 43-7 at 6.) Dr. Malekafzali noted that plaintiff should have an x-ray of both feet in standing position, should be re-evaluated again with a MRSA screen and maybe a cortisone injection to the joint; and if the foot is not getting better, to have an MRI and may be a fusion of this joint.  (Id.) Dr. Malkafzali also noted that he would like to stay with conservative treatment as possible.  (Id.) Mr. Malekafzali ordered for plaintiff to be re-evaluated in four weeks and if he still had pain, he would be a candidate for a fusion of the joint surgery.  (Id.) Without further information, it is difficult to evaluate the relevance of Dr. Malekfzali's recommendations for the treatment of plaintiff's foot injury in January 2014 to the treatment plaintiff received in in 2012.

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 10, 2014

Es946.sj

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE